UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PAPE TAMBA, | ]<br>] |
| Plaintiff/Counter-Defendant, | ]<br>] |
| v. | ] CIVIL ACTION NO.<br>] 2:18-CV-00392-KOB |
| PUBLIX SUPER MARKETS, INC., | ]<br>] |
| Defendant/Counter-Claimant. | ] |

## MEMORANDUM OPINION

This employment discrimination and breach of contract case comes before the court on Defendant Publix Supermarket, Inc.'s motion for summary judgment as to Plaintiff Pape Tamba's claims and Publix's counterclaims. (Doc. 22).

Publix asserts that it terminated Mr. Tamba, who is African-American and an immigrant, for dishonesty, not because of his race or national origin. And no dispute exists that Publix reasonably considered Mr. Tamba to be dishonest.

Even so, Mr. Tamba contends that Publix committed race and/or national origin discrimination because it did not terminate two allegedly similarly-situated employees, one who was white and one who was not an immigrant. But no evidence shows that Mr. Tamba and the white employee were similar in any material respects and the non-immigrant employee does not exist on the record. And Mr. Tamba offers no other circumstantial evidence of discrimination. So the

1

court will grant Publix's motion for summary judgment on Mr. Tamba's claims.

Publix also moves for summary judgment on its counterclaims against Mr. Tamba. According to Publix, Mr. Tamba breached a relocation benefits contract by not returning any of the money that Publix gave him to cover his moving expenses when he relocated from Florida to work at Publix's facility in Alabama. The company also claims that Mr. Tamba has been unjustly enriched by retaining those relocation benefits and other erroneous payments Publix made to him.

Mr. Tamba does not meaningfully dispute the evidence that shows he breached the contract by not returning his relocation benefits, so the court will grant summary judgment in favor of Publix on its breach of contract counterclaim. But genuine disputes of material fact preclude summary judgment on Publix's unjust enrichment counterclaim.

**I.    STANDARD OF REVIEW**

A trial court can resolve a case on summary judgment only when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

As to the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'" *Evans v. Books-A-*

*Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). And when considering whether any genuine disputes of material fact exist, the court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Pursuant to these rules, the court presents the facts supported by evidence on the record in the light most favorable to Mr. Tamba.

## II. FACTS

### A. Payment Issues After Mr. Tamba's Transfer to Alabama

For the majority of 2016, Mr. Tamba worked as a forklift operator at Publix's warehouse in Lakeland, Florida. At the end of 2016, Mr. Tamba completed an application for a position titled "truck driver/truck driver trainee" at Publix's warehouse and distribution center in McCalla, Alabama. (Doc. 24-3 at 16–17, 86).

Publix accepted Mr. Tamba's application and agreed to cover his expenses to relocate to McCalla. Pursuant to a "Relocation Package Repayment Agreement" that both parties signed, Publix paid Mr. Tamba, or moving companies on his behalf, $15,246.57 in moving expenses. (Doc. 24-3 at 16, 85; Doc. 24-6 at 2). The Repayment Agreement provided that if Mr. Tamba left

3

Publix within 12 months of receiving the relocation benefits, he would have to fully reimburse Publix for those payments.

Though Mr. Tamba applied for a position titled "truck driver/truck driver trainee," "truck driver" and "truck driver trainee" are different positions with different rates of pay. Truck drivers drive over the road and can initially make $21.85 per hour, while truck driver trainees move trailers and perform spotter driver duties only on Publix's property and can initially make $16.79 per hour. Truck driver trainees train to eventually become truck drivers in the event of a truck driver position vacancy.

The truck driver/truck driver trainee distinction caused confusion that followed Mr. Tamba throughout his employment with Publix in Alabama. First, Publix accepted Mr. Tamba's "truck driver/truck driver trainee" job application and, according to the company, hired him as a truck driver *trainee*. (*See* Doc. 24-8 at 2) (email from Publix manager informing an administrator that Mr. Tamba would be transferring as a truck driver trainee). But Publix internally classified him as a truck driver making $21.85 hour, rather than a truck driver trainee making $16.79 per hour. (Doc. 24-1 at 22; Doc. 24-5 at 38; Doc. 24-7 at 3–4; Doc. 24-9 at ¶ 9). Publix contends that its administrator made this mistake because several other transfers from Lakeland, Florida were truck drivers.

On the other hand, on a "Job Offer Acceptance and Commitment Form," Mr.

4

Tamba checked a box for "Truck Driver"—and *not* "Truck Driver Trainee"—following the statement, "I accept a transfer to the following position in the McCalla Distribution Center." (Doc. 24-5 at 30). Mr. Tamba and the Dispatch Superintendent at the Florida facility, Alan Dorman, signed the commitment form.

After transferring to McCalla on April 8, 2017, Mr. Tamba only performed spotter driver duties at the facility and never drove a truck over the road; *i.e.*, he did not perform the duties of the "truck driver" position. But he received truck driver pay during the entire month of April. (Doc. 24-3 at 97–99; Doc. 24-5 at 38).

In early May 2017, Publix discovered that Mr. Tamba had been receiving truck driver pay since he transferred to McCalla, which Publix considered a mistake because, according to the company, Mr. Tamba transferred as a truck driver trainee, not a truck driver. In an email sent to Publix Human Resources, a manager at the McCalla facility stated, "[Mr. Tamba] has been overpaid about $500 for the month of April because Paul Chambers misclassified his position in his transfer paperwork. He was listed as a Truck Driver but he is working in Trailer Movement." (Doc. 24-1 at 79). Publix decided that it would reduce Mr. Tamba's paychecks by $200 per week until it fully recouped the $500 overpayment.

But the mistakes continued. On Mr. Tamba's next paycheck, issued on May 4, 2017, Publix withheld the entire $500 overpayment, rather than the $200 per

week as agreed. When Publix attempted to correct this mistake on May 11, 2017, it made yet another mistake—the company overpaid Mr. Tamba *again*. Publix paid Mr. Tamba as if he had worked 143.65 hours during the week of April 22, 2017, when he had actually worked only 51.68 hours, *and* Publix paid him the truck driver rate instead of the truck driver trainee rate. (Doc. 24-3 at 100–01; Doc. 24-7 at ¶ 8). According to Publix, these errors caused a net overpayment to Mr. Tamba of $2,009.54.

Finally, Publix gave Mr. Tamba paid leave from May 2 to May 4, 2017 in return for his agreement to work the holidays of Memorial Day, July 4, and Labor Day later that year. But Mr. Tamba never worked those holidays. So, according to Publix, it paid Mr. Tamba $1,049.89 for working holidays that he did not work.

The court will return to these alleged overpayments later.

### B. The June 8, 2017 Incident and Mr. Tamba's Termination

The court now examines the events surrounding Mr. Tamba's termination. Mr. Tamba does not dispute the following interpretation of surveillance footage captured of him.

Surveillance footage taken at Publix's McCalla facility shows that, on June 8, 2017 at 11:33 p.m., Mr. Tamba parked his tractor and trailer outside, did not set the parking brake, exited the tractor, and entered the return center building. (*See* Doc. 24-11). Approximately one minute later, the tractor and trailer drifted

forward and the tractor hit a parked trailer. The collision dented the tractor and the parked trailer.

Approximately one minute after the collision, Mr. Tamba returned and saw that the tractor had hit the parked trailer. He backed the tractor up, appeared to review the damage, and then backed the tractor up to the loading dock. He exited the tractor, left its lights on, and again appeared to inspect the damage.

Approximately six minutes later, Mr. Tamba again appeared to review the damage to the tractor. Then he exited the tractor, left its lights on, and walked back to the damaged trailer. He then drove the tractor to another location.

Approximately 40 minutes later, at 12:23 a.m. on June 9, 2017, Mr. Tamba drove his tractor back to the damaged trailer, realigned the damaged trailer, and backed it into place. The relevant surveillance footage ends there.

Later in his shift, Mr. Tamba reported to the return center lead, Deonta Harvard, and the safety manager, Russ Weiner, that the front of his tractor was damaged. Mr. Harvard asked Mr. Tamba to write an incident report. On an "Incident Analysis Form," Mr. Tamba wrote, "I was doing the post trip inspection and I found damage on the front and [right] side of the tractor. I may [have] hit something or I was hit by someone. I immediately advise[d] the return center lead person." (Doc. 24-3 at 123).

In an email sent to the return center manager, Godfrey Saunders, on June 9,

2017 at 3:20 a.m., Mr. Harvard stated that he asked Mr. Tamba to complete a post driver vehicle inspection report before leaving. (Doc. 24-12 at 2). The email states, "[Mr. Tamba] went outside to inspect his [tractor] and noticed that the front was damaged that wasn't there at the beginning of the shift. [Mr. Tamba] noted that he did not know his truck was damaged or when it actually happened." (*Id.*). According to the email, Mr. Harvard and the supervisor on duty, Tim Meek, found several pieces of Mr. Tamba's truck in front of the door where the collision happened.

Then, at 4:03 a.m. on the same morning, Mr. Meek sent an email to Mr. Saunders and several other managers that stated, "[Mr. Harvard] said that [Mr. Tamba] was doing his post trip inspection when he noticed the damage. [Mr. Tamba] said that he didn't notice anything when he did his pre-trip inspection, so it must have happened on his shift." (Doc. 24-12 at 2). The email states that Mr. Meek and Mr. Tamba walked around the yard and found pieces of the tractor's reflector near a loading dock door. The email also states, "[Mr. Tamba] said that he backed a trailer into that door when the dock coordinator called him on the radio to come inside for a second. . . . He didn't notice anything when coming back out." (*Id.* at 3).

To investigate the incident, Mr. Saunders reviewed Mr. Tamba's incident report, the emails from Mr. Harvard and Mr. Meek, and the surveillance footage.

8

Mr. Saunders believed that the surveillance footage showed that Mr. Tamba saw that he caused the collision, so Mr. Saunders determined that Mr. Tamba was dishonest when he wrote on the incident report that he "may [have] hit something or I was hit by someone." (Doc. 24-2 at 26). Thus, Mr. Saunders decided to terminate Mr. Tamba for dishonesty. (*Id.* at 20).

When Mr. Tamba arrived for his next shift, Mr. Saunders and the dispatch superintendent, Paul Chambers, met with Mr. Tamba and informed him that Publix was terminating him for dishonesty. Mr. Tamba testified that he could "understand why Publix would think that [he was] lying on [the incident] report or not being honest." (Doc. 24-3 at 42).

### C. Mr. Tamba's Claim

In his complaint, Mr. Tamba brought claims for race and national origin discrimination, retaliation, and breach of contract. But he has abandoned his retaliation and breach of contract claims by not providing any argument for those claims in his response to Publix's motion for summary judgment. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018) ("The court finds that the Coles abandoned any suppression- or deceit-based fraud theory by failing to advance a relevant argument in response to Owners's

motion for summary judgment."). So only Mr. Tamba's claim that Publix terminated him because of his race and/or national origin in violation of Title VII and 42 U.S.C. § 1981 remains.

### D. Publix's Counterclaims

Publix asserts two counterclaims against Mr. Tamba: breach of contract and unjust enrichment. Publix contends that Mr. Tamba breached the "Relocation Package Repayment Agreement" by not repaying Publix for his relocation benefits after leaving the company within 12 months of transferring. Publix also contends that Mr. Tamba has unjustly enriched himself by retaining those relocation benefits, the amounts that Publix asserts it overpaid him in April and May 2017, and the money that Publix paid him for working holidays that he did not work.

## III. ANALYSIS

The court begins by analyzing whether any genuine issues of material fact exist as to Mr. Tamba's claim against Publix, and then turns to whether any genuine issues of material fact exist as to Publix's counterclaims against Mr. Tamba and whether Publix is entitled to judgment on its counterclaims as a matter of law.

### A. Motion for Summary Judgment as to Mr. Tamba's Claim

Mr. Tamba does not offer any direct evidence of race or national origin discrimination; instead, he relies on materials that he contends constitute

circumstantial evidence of race and/or national origin discrimination.

When a plaintiff relies on circumstantial evidence, he may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to establish a Title VII race or national origin discrimination claim. Under this framework, a plaintiff first must establish a *prima facie* case of discrimination. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). A plaintiff succeeds at this step by showing that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside of his protected class. *Id*.

To show that his employer treated him less favorably than a similarly-situated individual outside of his protected class, the plaintiff must present evidence that he and that individual—a so-called "comparator"—were "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019). Ordinarily, a comparator similarly situated in all material respects "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's

11

employment or disciplinary history." *Id.* at 1227–28 (citations omitted). And "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)).

Here, Mr. Tamba offers two purported comparators: white employee "XX," and African-American non-immigrant employee "YY." For the following reasons, neither individual is similarly situated to Mr. Tamba in any material respects and is thus not a valid comparator to support a *prima facie* case of discrimination.

Starting with XX, the only evidence of this employee on the record—Publix's supplemental interrogatory responses and production of records—shows that XX was somehow associated with a damaged "ICC bar" on a trailer. (*See* Doc. 38). The evidence regarding XX ends there, so it fails to show how XX was similarly situated to Mr. Tamba in any respects.

Even accepting Mr. Tamba's version of XX, that employee is still not a valid comparator. According to Mr. Tamba, "XX lifted a trailer too [and] damaged a trailer. Another employee reported the damage[], not the responsible party. . . . An 'awful noise' was [] made [and] the trailer had to be removed from service. . . . The trailer had over $1,000.00 in damage. No incident report was filed and there is no suggestion engaged [sic] video review." (Doc. 34 at 25). So, according to Mr. Tamba, both he and XX damaged Publix's property, but only Mr. Tamba was

12

fired, thus raising a question of discrimination.

But Mr. Tamba misses the point. Publix fired him for dishonesty, *not* for damaging property, and no evidence shows that XX was dishonest. The record is silent as to whether XX knew about the damage to the ICC bar, whether Mr. Tamba's supervisors knew about the damaged ICC bar or XX's association with it, or what XX told anyone about the damage. So no evidence supports an inference that Mr. Tamba and XX engaged in similar misconduct for which only Mr. Tamba was terminated. Thus, XX is not a valid comparator.

Turning to Mr. Tamba's second purported comparator, YY, the record has no evidence of this employee. Mr. Tamba mentions YY in only two sentences in his brief in opposition to the motion for summary judgment: "African-American and non-immigrant YY failed to notice that he [sic] his trailer doors were not secure and he bent and broke the hinges. Publix 470. There is no suggestion that Wainer pulled the video to see if YY walked around the truck an[d] could be charged with being 'dishonest.'" (Doc. 34 at 27). But, after reviewing the entire record, the court cannot locate a document Bates-stamped "Publix 470." Mr. Tamba did not correct that citation in his motion to amend his brief that identified more than 60 errors in his brief. (*See* Doc. 39). So, on the record before the court, YY simply does not exist and is thus not a comparator.

Mr. Tamba then suggests that, even if he has no valid comparator evidence,

13

his claim still must survive summary judgment because "[i]f there are legitimate disputes regarding whether the allegations [of dishonesty] are true summary judgment is inappropriate." (Doc. 34 at 28). But no evidence legitimately disputes that Mr. Tamba was dishonest, or, at the very least, and as Mr. Tamba admitted, that Publix reasonably determined that Mr. Tamba was dishonest. So no other circumstantial evidence supports an inference that Publix terminated him because of his race or national origin.

Mr. Tamba has not stated a *prima facie* case of discrimination under *McDonnell Douglas* or offered any evidence that could support an inference that Publix terminated him because of his race or national origin. So the court will grant Publix's motion for summary judgment on Mr. Tamba's claim.

### B. Motion for Summary Judgment as to Publix's Counterclaims

Publix next moves for summary judgment in its favor as to both its breach of contract counterclaim and unjust enrichment counterclaim against Mr. Tamba. For the following reasons, the court will grant summary judgment in Publix's favor as to its breach of contract counterclaim, but will deny summary judgment as to the unjust enrichment counterclaim.

*1. Breach of contract*

Starting with its breach of contract claim, Publix contends that Mr. Tamba breached the "Relocation Package Repayment Agreement" by not returning any

14

portion of the $15,246.57 that Publix paid him or moving companies on his behalf as relocation benefits. The Repayment Agreement provided that Mr. Tamba would reimburse Publix in full if he left the company within 12 months of transferring to Alabama. Mr. Tamba, of course, left the company well before 12 months passed, and he does not dispute that he has not returned any portion of his relocation benefits in response to Publix's requests for him to do so. So Publix seeks $15,246.57 in breach of contract damages.

To state a breach of contract claim under Alabama or Florida law, Publix must show "(1) the existence of a valid contract binding the parties in the action[;] (2) [its] own performance under the contract[;] (3) the defendant's nonperformance[;] and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995); *see Knowles v. C. I. T. Corp.*, 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977) (Florida law requires the same elements).

Here, Mr. Tamba does not dispute the validity of the Repayment Agreement; that the Agreement required him to pay back Publix in full if he "left" the company within 12 months of his transfer; that he "left" the company under the terms of the Agreement by being terminated within 12 months of his transfer; that Publix paid him or moving companies on his behalf $15,246.57 pursuant to the Agreement; or that he has not repaid Publix any portion of those funds.

Instead, in the less than one page of his opposition brief devoted to Publix's

15

breach of contract counterclaim, Mr. Tamba asserts that Publix cannot state a breach of the Repayment Agreement because Publix did not perform under the Commitment Form. (*See* Doc. 34 at 30). On the Commitment Form, Mr. Tamba marked that he accepted a transfer to Alabama as a truck driver. So, according to Mr. Tamba, because Publix transferred him as a truck driver trainee instead of a truck driver, he does not have to repay Publix for any of his relocation benefits.

But, even if Publix did breach the Commitment Form by transferring him as a truck driver trainee, no evidence shows how Publix's breach of the Commitment Form would affect Mr. Tamba's obligations under the Repayment Agreement. The undisputed facts remain that the Repayment Agreement was a valid contract, that Publix performed under the contract by paying $15,246.57 of Mr. Tamba's relocation expenses, that Mr. Tamba has not performed under the contract by not reimbursing Publix, and that Publix has suffered $15,246.57 of damages as a result. (*See* Doc. 24-6 at 2) (uncontroverted payment record showing that Publix paid Mr. Tamba $15,246.57 in relocation benefits). Thus, no genuine disputes of material fact exist as to each element of Publix's breach of contract claim and the company is entitled to judgment as a matter of law.

### 2. *Unjust Enrichment*

Turning finally to Publix's unjust enrichment counterclaim, the company contends that no genuine dispute exists that Mr. Tamba unjustly enriched himself

16

by retaining the $15,246.57 in relocation benefits, $1,484.21 in wages that Publix asserts it overpaid him by erroneously paying him the truck driver rate instead of the truck driver trainee rate, and $1,049.89 that Publix paid Mr. Tamba in advance to work holidays that he did not work. For the following reasons, the court disagrees.

To state an unjust enrichment claim, a plaintiff must show that the defendant "knowingly accepted and retained a benefit . . . provided by another . . . who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011). Also, the plaintiff must show that the defendant's "retention of a benefit would be unjust." *Id.* (citations and quotations omitted). "Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty[;] or (2) the recipient of the benefit . . . engaged in some unconscionable conduct . . . ." *Id.* at 146 (citations and quotations omitted).

Here, Publix cannot recover the relocation funds under its unjust enrichment counterclaim because the court found that Publix is entitled to those funds as damages under its breach of contract counterclaim. *See Cajun Steamer Ventures, LLC v. Thompson*, 2019 WL 3068430, at *16 (N.D. Ala. July 12, 2019) (a plaintiff "cannot *recover* for breach of contract and unjust enrichment") (emphasis in original).

Next, a genuine dispute over what Mr. Tamba's position *should* have been at the Alabama facility challenges whether Mr. Tamba retaining the truck driver pay would be unjust. The Commitment Form shows that Mr. Tamba accepted a transfer to the Alabama facility as a truck driver, as opposed to a truck driver trainee. Publix's Dispatch Superintendent signed the form. So, evidence exists that could support the inference that Publix agreed to transfer and pay Mr. Tamba as a truck driver. If a jury credited this evidence, then Mr. Tamba would not be unjustly enriched by retaining the $1,484.21 in alleged overpayments; those funds would not, after all, be overpayments.

Finally, Publix has not shown that Mr. Tamba would be unjustly enriched by retaining the funds that Publix paid him in the form of paid time off from May 2 to May 4, 2017. Publix gave him the paid time off in return for his promise to work the holidays of Memorial Day, July 4, and Labor Day. But reasonable jurors could find that Publix unreasonably risked not getting the three days' worth of wages back by paying Mr. Tamba, an at-will employee paid by the hour, well in advance of those days. And Mr. Tamba could not possibly work July 4 and Labor Day as he promised because Publix terminated him. So genuine disputes of fact as to whether Mr. Tamba would be unjustly enriched preclude summary judgment on Publix's unjust enrichment counterclaim.

## IV. CONCLUSION

For the reasons stated above, by separate order, the court will **GRANT IN PART** and **DENY IN PART** Publix's motion for summary judgment. (Doc. 22).

Specifically, the court will **GRANT** Publix's motion for summary judgment as to Mr. Tamba's claims against the company. The court will **GRANT** Publix's motion for summary judgment as to its breach of contract claim against Mr. Tamba and will **ENTER JUDGMENT** against Mr. Tamba and in favor of Publix in the amount of $15,246.57. And the court will **DENY** Publix's motion for summary judgment as to its unjust enrichment claim.

**DONE** and **ORDERED** this 20th day of September, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE